## THE GEZINA.

### THE G. W. PATTERSON.

REDERISELSKABET GEZINA et al. v. RIGGINS et al. (C. H. SPRAGUE & CO. et al., Interveners).

No. 4132.

Circuit Court of Appeals, Fourth Circuit.

April 6, 1937.

**301**

yard & Milburn and Rush Taggart, all of New York City, Hughes, Little & Seawell, of Norfolk, Va., and Albert T. Gould, of Boston, Mass., on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

NORTHCOTT, Circuit Judge.

This is a libel in admiralty filed in the District Court of the United States for the Eastern District of Virginia, at Norfolk, in November, 1934, by the appellee W. H. Riggins, master of the barge G. W. Patterson, on behalf of the owner of said barge, and her freight money, and on behalf of the owner of the cargo of coal laden on said barge, and W. H. Riggins, in his own right, against the appellee the Rederiselskabet Gezina, a Norwegian corporation, owner of the steamship Gezina. The object of the libel was to recover damages for a collision between the steamship Gezina and the barge G. W. Patterson.

W. H. Riggins, in his own right, and Burns Holmes, as seaman on board the barge G. W. Patterson, filed an intervening libel and petition.

The owner of the steamship filed an answer to the libel and a cross libel. The various libels were amended as well as the answers and on petition of the owner of the steamship the Southern Transportation Company, a corporation, owner of the tug Nassau, and D. T. Sheridan, owner of the barge G. W. Patterson, were brought into the cause as parties.

In order to secure the release of the steamship Gezina from an attachment, H. Hansen, master, as principal, and National Surety Corporation as surety, executed surety bonds to secure the payment of costs and all damages and loss arising out of the matters set forth in the respective pleadings.

After the issues were settled a hearing was had in December, 1935 at which a number of witnesses were examined orally and the depositions of other witnesses were filed.

In July, 1936, the trial judge filed an opinion holding the steamship Gezina solely at fault for the collision and an interlocutory decree was entered against the appellants, Rederiselskabet Gezina, owner of the steamship Gezina, H. Hansen and National Surety Corporation, providing

John W. Griffin, of New York City, and Braden Vandeventer, of Norfolk, Va. (Haight, Griffin, Deming & Gardner, of New York City, and Vandeventer & Black, of Norfolk, Va., on the brief), for appellants.

Leon T. Seawell and John W. Oast, Jr., both of Norfolk, Va. (Carter, Led-

for the recovery of the damages resulting from the collision. From this decree this appeal was brought.

The facts, as found by the trial judge, show that the tug Nassau sailed from Hampton Roads, Va., for New England ports with three barges in tow. On arriving at New London, Conn., one barge was dropped and the tug proceeded with two barges, the Chenango and the G. W. Patterson, on her voyage to Boston, Mass.

The Chenango, the head barge in the tow after passing New London, is 268 feet long, was laden with coal, and had a crew consisting of a master and two seamen.

The barge G. W. Patterson, the second barge in the tow, had a length of 226.2 feet (240 feet over all), 35.1 feet beam, and a depth of 14.9 feet and was also laden with coal. Her crew consisted of the master, engineer, and a deck hand.

The tug Nassau, impleaded in this proceeding by cross-libelant Rederiselskabet Gezina, owner of the Gezina, is 141.5 feet long and had aboard a full crew at the time of the collision.

The steamship Gezina was bound from Boston for Hampton Roads, Va., and was of Norwegian registry, owned by appellant Rederiselskabet Gezina, is 265 feet long, 43 feet 6 inches beam and her dead weight 2875 tons. At the time of the collision she was light and was drawing about 9 feet forward and 12 feet 3 inches aft. She had aboard master, mate, second mate, and a full crew.

In proceeding from New London to Boston the tug Nassau and her two barges in tow passed through Vineyard and Nantucket Sounds. The steamship Gezina on its voyage also passed through those Sounds so that the steamship, the tug and barges in tow, for some time before as well as at the time of the collision, were in inland waters of the United States.

The hawser by which the barge Chenango was fastened to the tug Nassau was about 225 fathoms long, and the hawser with which the Patterson was fastened to the barge Chenango was approximately 150 fathoms long. The total length of the tow including the tug and the two barges was, as found by the trial judge, "over 2700 feet or in excess of half a statute mile." The judge below further found that when the tug and tow passed Gay Head on its voyage the hawser should have been shortened pursuant to the requirements of the Pilot Rules for Inland Waters and that this was not done. Had the hawsers been shortened in compliance with the rule the total length of the tow would have been reduced to approximately 1,400 feet.

The speed of the tug Nassau after it passed the point where the hawsers should have been shortened, to comply with the Pilot Rules, was such that the crews of the barges could not have shortened them had they so desired without the tug slowing down or stopping. No signal or request was given from the barge Patterson for the tug to slow down or stop for that purpose, and the testimony reveals that the action of the tug in towing the barge Patterson through the two Sounds had the full approval of the barge's master and that the owner of the barge Patterson knew of this practice of tugs in towing his barges through inland waters without shortening hawsers. From these facts the judge below concluded that the failure to shorten the hawsers on this occasion had the implied approval of the owner of the barge Patterson.

The night on which the collision occurred was dark, with an overcast sky, but conditions for seeing lights on and around the waters in question were favorable. There was no wind or sea of any consequence which would have prevented or rendered dangerous the shortening of hawsers. The tide was flood in the vicinity of the place of the collision with a strength of about two knots or more an hour.

As the tug approached Vineyard Haven, the weather was somewhat threatening and the master of the tug decided to anchor his tow in the Haven. Vineyard Haven is a body of water lying between West Chop and East Chop and is much used for anchorage purposes. As the tug and barges proceeded by West Chop, their course was northeastward until the tug commenced to turn to the south and then southwestward to go into Vineyard Haven. In making this maneuver the tug entered Vineyard Haven to the eastward of midway between West Chop and East Chop. The wind was to the southward but with only negligible effect upon the courses of any of the vessels involved.

The Gezina was steering by objects and not by compass, her course, however, being well lighted. The collision occurred shortly after 9 p. m. on November 10, 1934. The steamship struck the barge Patterson

at an angle of about 45 degrees on the port side of the latter, about 35 or 40 feet from the stern, cutting nearly half way through the barge, which settled by her stern very rapidly, the stern settling to the bottom in not to exceed twenty minutes.

Shortly after the collision the Bureau of Lighthouses located and marked the wreck of the Patterson. After careful consideration, as he states in his opinion, of the testimony in the light of the position of the wreck of the barge Patterson, as marked by the Bureau of Lighthouses, the judge found that the collision occurred within the red sector of West Chop light, within well-defined anchorage grounds and sustained the contention made on behalf of the tug and the barge Patterson as to the place of the collision.

The judge further found that all of the four vessels involved were properly and sufficiently lighted and that the crew of the barge Patterson saw the lights of the steamship Gezina before there appeared to be any danger of collision. That the Gezina approached at full speed without any change in her course and that the barge Patterson blew danger signals, which for some reason were not heeded but were repeated shortly before the collision. These signals were of sufficient volume and strength to have been heard a mile or more and had the first signals been heard and seasonably heeded the collision would not have occurred. Those in charge of the steamship Gezina testified that they heard only one set of signals immediately before the collision. Lights on the tug and the barge Patterson were seen some time before the collision and those on board the Gezina claimed to have thought the lights on the Patterson to be on an overtaken vessel or a vessel at anchor, but no serious attempt was made to determine the real import of the lights they saw. Those on the Gezina knew from the lights that the tug had two vessels in tow and could also see the lights on both barges but made no effort to determine which lights were on the tow and the steamship did not slow down, as proper precaution would demand.

The judge also found that the master and other officers of the steamship Gezina were not familiar with the waters in question and there was no local pilot or other navigator aboard who was familiar with them. The master of the vessel had made two and a half round trips through the waters, but his last trip through them had been made about two years before the night of the collision. He did not know that Vineyard Haven was a frequent anchorage for tugs and tows. The steamship Gezina was proceeding at full speed, about 9 knots an hour, through practically unfamiliar waters, at night, on the wrong side of the channel, and did not slow down until the collision was inevitable and no substantial part of her momentum was killed before the impact.

The only question involved in this appeal is whether there was any such fault on the part of the tug or the barge G. W. Patterson as would render them liable for the whole or a part of the damages resulting from the collision or whether the steamship Gezina was solely at fault.

That the steamship Gezina was at fault in the collision appears conclusively from the facts shown in the record and as found by the trial judge. She was being navigated through waters with which her captain was not thoroughly familiar, at night, and without a pilot on board and while she was not required to have such pilot she should, under the circumstances, have proceeded with at least some degree of caution. This she did not do, but was proceeding at full speed on the wrong side of the channel, through waters well known to be used for anchorage purposes, with such a reckless disregard of any damages that might be caused, that the conclusion seems to be inevitable, as found by the judge below, that the officers were confused or lost. Her officers saw the lights on the tug informing them that the tug had two vessels in tow. The lights on the tug and the two barges in tow were all lighted and visible and were seen, or should have been seen with a proper lookout, from the Gezina, yet no precautions were taken, a course of conduct which, under the circumstances, is inexcusable. Warning signals were given from the barge Patterson which if heeded would have avoided the collision yet no attention was paid to them, another circumstance leading to the inference that a proper watch was not being kept aboard the steamship. The master of the steamship admitted that he did not know that Vineyard Haven was a frequent anchorage for tugs and tows. The steamship struck the Patterson at virtually full speed, so that she cut nearly halfway through the barge. Vineyard Sound has been held to be a nar-

row channel, within the meaning of Inland Rules (33 U.S.C.A. § 210), The Edda (C.C.A.) 173 F. 436, and the officers of the Gezina in navigating it in the manner they did violated the "Narrow Channel Rule."

When we come to consider the question of whether the tug and barges were also at fault, as contended on behalf of the appellants, we are confronted at the threshold with the fact that the hawsers, with which the barges were being towed, were of an unlawful length while used in navigating inland waters. The Pilot Rules, adopted under authority of Acts of Congress approved June 7, 1897, 30 Stat. 96, 102, § 2, 33 U.S.C.A. § 157; Act Feb. 14, 1903, 32 Stat. 825, and Act March 4, 1913, 37 Stat. 736, for the regulation of Navigation in harbors, rivers, and inland waters of the United States, have the force of law. They provide, among other things, as follows:

" * * *

"2. Hawsers are limited in length to 75 fathoms measured from the stern of one vessel to the bow of the following vessel; and should in all cases be as much shorter as the weather or sea will permit."

Pilot Rules 1933, pp. 35 and 36.

The hawsers used by the tug Nassau in towing the barges Chenango and Patterson were much in excess of the limit fixed by the rule and the evidence shows that the masters of the barges and their owners tacitly consented to the violation of the rule.

The violation of the rule by the tug and barges being undoubtedly established the burden is cast upon the tug and barges to show that such violation could not have contributed to the injury. Authorities to this effect are numerous and the principle was early laid down by the Supreme Court in The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148. See, also, New York, P. & N. R. Co. v. Wilkins (C.C.A.) 257 F. 42, certiorari denied 249 U.S. 605, 39 S.Ct. 288, 63 L.Ed. 798.

In considering the question of whether the violation of the rule contributed to the collision here, it becomes vitally necessary to fix the point of the collision. While the steamship would not be justified in deliberately or even recklessly running down a vessel being towed in the channel at the end of an unlawful hawser, certainly, if the vessel being towed has reached anchorage ground and is preparing to anchor then a steamship running at full speed, recklessly regardless of any precaution, would be solely at fault and the unlawful length of the hawser could not in any way have contributed to the collision.

The judge below decided that the collision occurred within the red sector of West Chop light and within known anchorage ground. In the trial of the cause the judge heard a number of witnesses and it is well settled that under these circumstances the finding of a trial judge as to a question of fact is entitled to great weight. As was said by this court in The Corapeake, 55 F.(2d) 228: "This court has repeatedly laid down the rule that the finding of a trial judge, who had the opportunity of seeing the witnesses, hearing their story, judging their appearance, manner, and credibility, on a question of fact, is entitled to great weight and will not be set aside unless clearly wrong. Virginia Shipbuilding Corporation et al. v. United States (C.C.A.) 22 F.(2d) 38; Lewis v. Jones (C.C.A.) 27 F.(2d) 72; Chesapeake Lighterage & Towing Co., Inc., v. Baltimore Copper Smelting & Rolling Co. (C.C.A.) 40 F.(2d) 394; Lambert Lumber Co. v. Jones Engineering & Construction Co., Inc., et al. (C.C.A.) 47 F.(2d) 74; Commercial Casualty Ins. Co. v. Williams, (C.C.A.) 49 F.(2d) 472."

A study of the record including, as the evidence does, the statements of witnesses, the admitted short time in which the barge Patterson sank after being struck, the place of the wreck as marked by Government officials, the direction of the tide, and other circumstances, leads us to the conclusion that the judge below made the proper finding. Certainly we cannot say that he was clearly wrong, and giving to his finding that weight to which it is entitled, we conclude that the barge Patterson was struck while within well-known anchorage grounds at Vineyard Haven and while preparing to anchor. The trial judge in his opinion has clearly and concisely summed up the situation as he found it from the evidence. He said, among other things: "Keeping in my mind that the Pilot Rules have the force of law and that ordinarily the burden is on one who violates them and seeks to escape liability therefor to show that the violation could not have caused or contributed to the collision, it would nevertheless seem that this

rule does not aid the Steamer Gezina under the circumstances of this case. Had the collision occurred in the fairway or at any time before the Tug and barges entered the anchorage grounds in Vineyard Haven, the situation would be different. But that is not the case. The Tug and the barge Chenango were some distance within and the barge Patterson also had entered, the red sector of West Chop light before the Gezina struck the Patterson. In those circumstances, whatever may have been their fault while in the fairway it would seem that the status of the Tug and each barge at the time of the collision was that of a vessel in anchorage grounds preparing to anchor for the night. The tug and barges had a right to be where they were but the Steamer did not have such right. It would appear therefore to be pressing the rule to unjustified lengths to apply it against a vessel about to anchor in grounds duly set aside for that purpose when struck by another vessel which was without any justification for being in the anchorage, simply because at a prior time the Tug and barge had violated the rule requiring the shortening of hawsers."

Courts should not in any way fail to strictly enforce rules governing the conduct of vessels navigating waters of the United States, nor do we wish to be considered as so doing here, yet the violation of the rule ended when the tug and tow reached anchorage grounds and a vessel cannot wantonly be destroyed because of some unlawful practice which had ceased and which in no way contributed to the collision.

The testimony failed to establish the existence of any other fault alleged against the tug and barges. The officers of the steamship in violation of every proper precaution that should have been taken, seeing a vessel which they testified they thought was an overtaken vessel yet not slowing down, ran into that vessel. The collision took place in anchorage ground when the barge was about to anchor. Those in charge of the Gezina failing to heed warning whistles and light signals, forging ahead at full speed in waters with which they were not thoroughly familiar, on the wrong side of a lighted channel, were solely responsible for the collision.

The decree of the court below is affirmed.

Affirmed.